**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-400 (TJK)** |
| **BRYAN ROGER BISHOP** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence BRYAN ROGER BISHOP to a term of 51 months of incarceration, at the low end of the applicable advisory Sentencing Guidelines range of 51 to 63 months, plus three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, Bryan Roger Bishop, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Bishop, a 52 year-old disabled military veteran, intentionally sprayed a chemical irritant at two Metropolitan Police Department (MPD) officers who were on the West Plaza of the U.S. Capitol Building. Bishop sprayed one officer directly in the face and another in the face by aiming in an upward angle to spray under the officer's face shield. Bishop then entered the U.S. Capitol Building, remaining inside for approximately 17 minutes.

The government recommends that the Court sentence Bishop to 51 months of incarceration for his conviction of 18 U.S.C. 111(a)(1). A 51-month sentence reflects the gravity of Bishop's conduct, but also acknowledges his early admission of guilt and mental health challenges.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 40, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Bishop's Role in the January 6, 2021 Attack on the Capitol

Bishop's crimes on January 6 were documented through body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol. He traveled to Washington, D.C. from Florida with his then-girlfriend, now wife, Tonya Bishop,[2] arriving on January 5, 2021. He and Tonya Bishop attended the "Stop the Steal" rally on the National Mall on January 6, along with his parents and his two brothers. The Bishop Family left the rally together and walked to the U.S. Capitol grounds. Bishop wore a grey jacket, an olive-colored beanie style hat, and a tan gator style face covering, as shown in Image 1 below.



*Image 1: Bishop on January 6, 2021*

**Bishops Sprays MPD Officers on West Plaza of U.S. Capitol Building**

By 2:00 p.m. rioters had breached various barriers that were erected on the west side of the Capitol building and were attempting to overwhelm police officers positioned there. At approximately 2:02 p.m., Bishop, now separated from his family members, emerged from the

---

[2] On November 28, 2023, the United States charged Tonya Bishop by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 7, 2024, pursuant to a plea agreement, Bishop pleaded guilty to Counts Three and Four of the Information, charging her with a violation of 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 11, 2024, this Court sentenced Bishop to 24 months' probation, 80 hours of community service, and $500 in restitution.

crowd of rioters and aimed a red colored device at the line of officers, assaulting the officers by spraying them with an orange-colored chemical irritant.



*Image 2: Screenshot from Body Worn Camera of Officer A.A. at 2:02 p.m. on January 6, 2021 (Bishop circled in red)*



*Image 3: Closeup of Image 2*

The FBI located open source video of Bishop's assault upon MPD officers from another angle. The video shows Bishop spraying MPD Officer A.A.[3] directly in the face with a chemical substance. *See* Exhibit 1. After spraying Officer A.A., Bishop sprayed MPD Officer B.S.[4] in the

---

[3] A victim impact statement from Officer A.A. is attached to this memorandum as Exhibit 2.
[4] A victim impact statement from Officer B.S. is attached to this memorandum as Exhibit 3.

face shield and then aimed at an upward angle to spray under Officer B.S.'s face shield and directly into his face. *Id*. Officer B.S. was interviewed by the FBI and stated that the chemical irritant hit his face shield and ended up in his eyes. His eyes immediately began to burn and he wasn't able to see anything. For the next seven to ten minutes, Officer B.S. had to fight through the crowd without being able to see and was in fear for his life. Due to his inability to see, Officer B.S. had to be led through the crowd by another officer.

 

*Image 4: Screenshot from Exhibit 1 – Open Source Video at 00:04 (Bishop circled in yellow)*

*Image 5: Screenshot from Exhibit 1 – Open Source Video at 00:06 (Bishop's hand circled in yellow)*

***Bishop's Entry into and Movement Within the Capitol***

After assaulting the two MPD officers, Bishop unlawfully entered the U.S. Capitol Building through the Upper West Terrace Door at 2:39 p.m. Bishop knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building.



*Image 6: Screenshot from CCTV at 2:39 p.m. (Bishop circled in red)*

Bishop traveled to the Rotunda, through Statuary Hall, and through the Statuary Hall Connector.



*Image 7: Screenshot from CCTV at 2:40 p.m. (Bishop circled in red)*



*Image 8: Screenshot from CCTV at 2:44 p.m. (Bishop circled in red)*

Bishop exited the U.S. Capitol Building at 2:56 p.m., approximately 17 minutes after he entered.



*Image 9: Screenshot from CCTV at 2:56 p.m. (Bishop circled in red)*



*Image 10: Bishop exiting the U.S. Capitol (Bishop circled in red)*

Bishop remained on U.S. Capitol grounds and reunited with Tonya Bishop once he exited the U.S. Capitol Building.

 

*Image 11: Bryan and Tonya Bishop on U.S. Capitol Grounds on January 6, 2021*

*Image 12: Bryan and Tonya Bishop on U.S. Capitol Grounds on January 6, 2021*

## III. THE CHARGES AND PLEA AGREEMENT

On November 15, 2023, a federal grand jury returned an indictment charging Bishop as follows: (Count One) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (Counts Two and Three) two counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Inflicting Bodily Injury, in violation of 18 U.S.C. §§ 111(a)(1), (b); (Count Four) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1), (b)(1)(A); (Count Five) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2), (b)(1)(A); (Count Six) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A); (Count Seven) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (Count Eight) Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 5104(e)(2)(F); and (Count Nine) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On April 30, 2024, Bishop pled guilty to the lesser offense of Count Three; Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

## IV. STATUTORY PENALTIES

Bishop now faces sentencing for Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory

special assessment of $100.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties and the Probation Office agree with the following guidelines calculation:

**Count Three: 18 U.S.C. § 111(a)(1)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | +14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Specific Offense Characteristics (dangerous weapon) | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Specific Offense Characteristics (bodily injury) | +3 |
| U.S.S.G. § 3A1.2(a)-(c) | Official victim | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | <u>-3</u> |
| | **Total** | **24** |

PSR ¶¶ 27-39; *see* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 42. Accordingly, based on the stipulated total adjusted offense level, after acceptance of responsibility, at 24, Bishop's Guidelines imprisonment range is 51 to 63 months' imprisonment. PSR ¶ 87.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bishop's violent, felonious conduct on

January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bishop violently and intentionally sprayed two MPD officers in the face with a chemical irritant. The nature and circumstances of Bishop's offense were of the utmost seriousness, and fully support the government's recommended sentence of 51 months imprisonment.

**B. The History and Characteristics of the Defendant**

Bishop is a 100 percent disabled military veteran. PSR ¶73. His military service is laudable, but it also makes his choices on January 6 even more troubling. Bishop claims he has received 25 service medals and awards and was credited with saving over 1,000 lives while serving his country, after receiving extensive training in rescue and medical treatment. *Id*. at ¶71; Mental Health Evaluation at 4, n.3. Given that past, the Court should be troubled that Bishop would betray the Military's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy. The Court should also be deeply troubled that Bishop would intentionally spray police officers in their faces with a chemical irritant, well aware of the damage it could cause.

According to the ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

On balance, Bishop's betrayal of the Military's core values and his mental health challenges weigh in favor of incarceration. Bishop's ███████████████ and Probation agree that Bishop would benefit from participation in programs offered by the Federal Bureau of Prisons, like the Resolve Program, designed to address the trauma-related mental health needs of inmates. *See* ███████████████ at 20-21; *see also* PSR ¶96. Probation also recommends the Federal Prisons Industries Program, which is designed to prepare inmates for successful reentry through job training. PSR ¶95. Since his retirement from Military service, Bishop had a series of jobs (nursing home, truck driver, pipefitter, and leather repairman) that he held for a brief period before he quit. *See* ████████████████ at 6. According to Bishop, he ████████████████████ ██████████████████████ *Id*. Therefore, Bishop would ██████████████████ █████████████████████████████████████████ *Id*. at 20.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bryan Bishop's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of incarceration. Although Bishop has no prior criminal history, his decision to participate in the events of January 6, 2021 calls for substantial deterrence. He insists that he was ███████ because of the large crowd, yet he joined the crowd in walking from the

---

[5]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

"Stop the Steal" rally to the U.S. Capitol. *See* ███████████████ at 13. Once at the Capitol,

████████████████████████████████████████████████████████████████████████

███████ and yet Bishop still did not leave the Capitol grounds.   *Id*. at 13-14. Instead, he assaulted

two MPD officers by spraying them with a chemical irritant provided to him at a rally the day

before, where he was told to ████████████████████ *Id*. at 13. Bishop could have chosen

to leave the chemical irritant in his hotel room, but he did not. And notably, while Bishop indicated

in his █████████████ that he was ███████ he also claimed not to recall the assaults,

wondered what happened right beforehand that would lead him to assault police officers, and

claimed the officers ██████████████████████████████████████████████

*Id*. at 14. Bishop's statements are disingenuous, given that the officers were dressed in full police

riot gear, *see* Ex. 1.   Those statements also reflect a lack of accountability for his actions and an

attempt to shift blame. An appropriate sentence must be imposed to prevent Bishop from repeating

these criminal acts in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United

States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

15

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Ryan Swoope*, 23-cr-20 (TNM), the defendant (1) assaulted a United States Capitol Police sergeant by spraying him in the face with a chemical irritant, (2) did so while

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the sergeant wore no form of protection against the irritant, and (3) blinded the sergeant for approximately 20 minutes as a result of the assault. Swoope also breached the U.S. Capitol despite clear signs that a riot was unfolding and that he was not allowed to be there, including sirens, broken glass, and police officers building a barricade with destroyed furniture. Swoope pled guilty to a violation of 18 U.S.C. § 111(a)(1), and Judge McFadden sentenced him to 51 months of incarceration.

Bishop's assaults were more aggravating than Swopes'. Bishop assaulted two officers who were in full riot gear, including face shields. Bishop nevertheless sprayed Officer A.A. directly in the face and targeted Officer B.S. by aiming under his face shield and intentionally spraying directly into his face. Officer B.S. was blinded and unable to see for approximately seven to ten minutes. Like Swoope, Bishop breached the Capitol building, entering through the Upper West Terrace doors despite knowing that he did not have permission to be there.

In *United States v. Aiden Bilyard*, 22-cr-34 (RBW), the defendant discharged "home defense pepper gel" at a line of uniformed MPD officers defending the Capitol building and used a metal bat to shatter the lower glass portion of a window and enter the Capitol. Bilyard remained inside for approximately 16 minutes. Bilyard pled guilty to violation of 18 U.S.C. §§ 111(a)(1) and (b). Judge Walton sentenced Bilyard to 40 months incarceration, which reflected a downward variance. Importantly, Bilyard was only 18 years-old at the time of his offenses and had cooperated with the United State's Attorney's Office which led to the charging of two uncharged individuals for their conduct on January 6.

And in *United States v. Cody Mattice & James Philip Mault*, 21-cr-657 (BAH), after participating in the breach of the police line across the West Plaza, the codefendants jointly assaulted police officers defending the Lower West Terrace tunnel with chemical spray. Mattice and Mault each pled guilty to a violation of 18 U.S.C. § 111(a)(1). Senior Judge Howell sentenced them both to 44 months incarceration. Notably, Mattice and Mault never entered the Capitol building, and had lower total offense levels than Bishop, at 21, because their chemical spray did not cause specific bodily injury.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case are MPD Officer A.A. and MPD Officer B.S., who suffered bodily injury as a result of Bishop's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bishop must pay $2,000 in restitution, which reflects in part the role Bishop played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.). Bishop's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VIII.  FINE

The defendant's convictions for violation of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. PSR ¶¶ 78-85.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months of incarceration, plus three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    s/ *Sonia W. Murphy*
SONIA W. MURPHY
Trial Attorney, U.S. Department of Justice
Detailed to the United States Attorney's Office
601 D Street, NW
Washington, DC 20001
D.C. Bar No. 483072
202-305-3067
Sonia.Murphy@usdoj.gov