## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **PLAINTIFF,** | **:** | |
| | **:** | |
| v. | **:** | **Criminal No. 23-cr-0400 (TJK)** |
| | **:** | |
| **BRYAN R. BISHOP,** | **:** | |
| | **:** | |
| **DEFENDANT.** | **:** | |
| _____ | **:** | |

### DEFENDANT BRYAN R. BISHOP'S MEMORANDUM IN AID OF SENTENCING

Bryan R. Bishop ("Defendant" or, alternatively, "Mr. Bishop"), through counsel Lionel André, respectfully submits this request pursuant to Federal Rule of Criminal Procedure 32, addressing the sentencing factors outlined in 18 U.S.C. §3553(a).  In aid of the Defendant's sentencing, we request the court to impose a sentence of eighteen months of home detention in coordination with the Veterans Outreach Program.  This program aims to prevent the unnecessary criminalization of mental illness and reduce extended incarceration among veterans by ensuring timely access to Veterans Health Administration (VHA) services for eligible justice-involved veterans.  This request aligns with the spirit and policy of the advisory Guidelines, is supported by significant mitigating evidence in this case, and meets the requirements of 18 U.S.C. § 3553(a) as a sentence that is "sufficient, but not greater than necessary to fulfill the purpose of sentencing" and is consistent with sentences in comparable cases.

## I. INTRODUCTION

Mr. Bishop deeply regrets the harm he caused to M.P.D. Officer A.A., M.P.D. Officer B.S., their families, and all others who were affected by his actions on January 6, 2021.

At his first opportunity to publicly accept responsibility, Mr. Bishop pled guilty for his actions. Specifically, on April 30, 2024, Mr. Bishop, 52-years old, pled guilty to one count of Assaulting, Resisting, and Impeding Certain Officers, in violation 18 USC § 11l(a)(l), a lesser included offense of Count 3 of the Indictment, pursuant to a written plea agreement. This offense carries a maximum sentence of 8 years imprisonment; a $250,000 fine; a term of supervised release of not more than three years; an obligation to pay any applicable interest on fines or restitution not timely made; and a $100 special assessment. PSR ¶ 4.

This Court has the discretion to consider Mr. Bishop's 21 years of service in the U.S. military, including ten combat tours as a medic, as well as the impact of related conditions such as Post-Traumatic Stress Disorder ("PTSD") and Traumatic Brain Injury ("TBI") on his conduct when determining his sentence. Mr. Bishop respectfully requests that the Court impose a sentence that prioritizes addressing his mental health issues, particularly in light of his documented health issues. Participation in VA treatment programs typically involve adherence to treatment plans and regular check-ins with mental health professionals. For veterans who do not require residential treatment, outpatient programs offer ongoing therapy, counseling, and support, allowing them to remain in their communities. In Mr. Bishop's case, he will continue home detention when not attending counseling or receiving in-patient treatment.[1]   Mr. Bishop now has a service dog named

---

[1] The Department of Veterans Affairs offers a wide range of health care services specifically for veterans, including mental health treatment, counseling, and support groups for those dealing with PTSD and TBI. Many communities offer programs and resources for veterans, including peer support groups, counseling services, and rehabilitation programs aimed at helping them reintegrate into society and manage their mental health conditions.

Sempre who he is bonding with and is making great strides in improving his mental health.  It would be unfortunate to disrupt his current mental health treatment program.

As described below, Mr. Bishop, 52 years old,  has never had any contact with the criminal justice system before the instant offense.  PSR ¶

When Mr. Bishop voluntarily enlisted in the military at 19 years old, he did not have any mental health issues or hearing loss.  During Mr. Bishop's 21 years of service as a U.S. Navy Corpsman and U.S. Air Force Aeromedical Evacuation Technician (combat medic), Mr. Bishop:

▪ Saved over 85 lives;

▪ Evacuated over 8,700 patients, mostly from war zones;

▪ Went on over 100 combat MEDEVAC missions; and

▪ Was deployed for 1,290 days in war zones and/or directly supporting combat missions.

For his military performance evaluation for the period of September 2, 2010 to September 1, 2011, Mr. Bishop's commanding officer commented that Mr. Bishop:

- ▪ ***Treated five IED blast casualties***; applied splints/IVs; managed shock/coordinated MEDEVAC; actions were key to ***100% survival – lives saved!***
- ▪ ***Maneuvered on foot under enemy fire***; supported 700 coalition forces
- ▪ Cared for coalition soldier with gunshot wound to leg; applied tourniquet / dressing / coordinated evacuation to Forward Operating Base -- ***saved soldier's leg***
- ▪ ***First responder to five battle injured Afghan children***; stabilized broken/lacerated limbs
- ▪ Superior Senior NCO medic; **leadership/attitude/drive/commitment level far exceeds peers...promote to Senior Master Sergeant now**
- ▪ ***Bronze Star*** recipient!
- **Supervisor's promotion recommendation:** Immediate Promotion

After 21 years of active military service, which included ten deployments in combat zones, Mr. Bishop now suffers from debilitating PTSD, TBI, and loss of hearing which requires that he wear hearing aids.

Counsel submits that there is a strong correlation between Mr. Bishop's actions on January 6th and ███████ health issues he developed while proudly, and heroically serving in the U.S. military and saving the lives of servicemen and civilians alike.[2]

As such, for the reasons set forth below and for those further enumerated at the sentencing in this matter, undersigned counsel respectfully recommends that this Court consider the significant mitigation in this case and grant Mr. Bishop a variance, well below the advisory Guidelines range determined by the Presentence Investigation Report ("PSR"). PSR ¶ 39.

This request is based upon the spirit of and the policy behind the advisory Guidelines, is supported by the reasons set forth under 18 U.S.C. § 3553(a) as a sentence which is "sufficient, but not greater than necessary to fulfill the purpose of sentencing," and is not disparate from sentences given in comparable cases.

Such a sentence would be sufficient but not greater than necessary pursuant to 18 U.S.C. §3553(a) and (b) because (1) Mr. Bishop has no prior criminal history, disciplinary actions, and has been a peaceful, law abiding citizen who voluntarily entered the U.S. military and served honorably for 21 years as a combat medic and saved over 85 lives; (2) as a result of his military service, he developed severe PTSD, suffered traumatic brain injury, and developed hearing loss

---

[2] Despite his exemplary and heroic military service, Mr. Bishop has been subjected to an unprecedented, relentless public vilification by the local media, abandoned and shunned by friends, neighbors, and shamed beyond measure. However, Mr. Bishop fully acknowledges that the shame, humiliation, public disgrace and scorn that he and his wife, Tonya, has and continues to suffer is of his own doing and, therefore, does not expect any sympathy from this Court in fashioning its sentence.

from two separate IED incidents; (3) he has such remorse for his actions against the two Metropolitan Police Officers that it weighted heavily in his attempts to hurt himself after his arrest; (4) his actions were not politically motivated; (5) he accepted responsibility promptly, agreeing to plead guilty for his actions; and (6) he and his wife have been vilified in the media and in his community.

## II.   APPLICATION OF SECTION 3553(A) FACTORS

18 U.S.C. § 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply with" federal sentencing goals and guidelines.  The section lists factors which intend to assist the Court in imposing a "sufficient, but not greater than necessary" sentence. Each factor is addressed in turn in the subsections below.

### 1. *The Nature and Circumstances of the Offense.*

Mr. Bishop is truly remorseful for the harm he caused M.P.D. Officer A.A. and M.P.D. Officer B.S., and anyone else in the community who may have suffered harm from his actions and the actions of others on January 6th.  He readily admits that spraying the two officers with pepper spray on January 6, 2021 was a horrible and harmful act.  As described in the PSR and Dr. Shauna Keller's Report, Mr. Bishop's conduct on January 6th was significantly out of character for him.[3]

On January 6, 2021, by approximately 2:00 p.m., rioters had breached various barriers that had been erected on the west side of the US Capitol Building and were attempting to overwhelm police officers positioned there.  At approximately 2:02 p.m., as depicted in the video, Mr. Bishop emerged from the crowd of rioters on the West Plaza and aimed a chemical irritant cannister at the line of officers.  Mr. Bishop sprayed Metropolitan Police Department (MPD) Officer A.A. directly

---

[3] Dr. Shauna Keller conducted a forensic mental health evaluation of Mr. Bishop (hereinafter "*Keller Rpt.*"), Attached as Exhibit No. 1. That report describes in great detail, Mr. Bishop's struggles with PTSD and TBI.

in the face shield with an orange-colored chemical irritant.  He then sprayed a second MPD Officer, B.S., in the face shield, aiming the spray at an upward angle in order to spray under Officer B.S.'s face shield and directly into his face, immediately causing the officer's eyes to burn.  Officer B.S. was unable to see for the next seven to ten minutes. PSR ¶ 21.

Based upon a review of the public video, closed circuit video ("CCV") footage, and police body-worn camera ("B.W.C.") footage depicting events at the U.S. Capitol building and grounds on January 6, 2021, law enforcement identified Mr. Bishop among the rioters that assaulted members of the MPD on the West Terrace of the U.S. Capitol building on January 6, 2021.

During Officer B.S.'s interview with the F.B.I., he stated, "[t]he chemical irritant hit his face shield and ended up on his face and in his eyes," causing a burning sensation and temporary loss of vision.  Officer B.S.'s inability to see caused him to fear for his life as another officer had to escort him through the crowd.  At 2:39 p.m., CCV video footage shows Mr. Bishop entering the U.S. Capitol building.  While inside, he walked amongst the Rotunda, Statuary Hall, Statuary Hall Connector and, on several occasions, appeared to be checking his phone and asking various individuals for directions before he exited the U.S. Capitol building after approximately 17 minutes, at approximately 2:56 p.m. PSR ¶ 22.

Mr. Bishop was arrested at his boat home in Florida by a SWAT Team in military gear and assault rifles on August 8, 2023.

### *Mr. Bishop's Conduct on January 6th*

On or about January 4, 2021, Mr. Bishop, and his then girlfriend, Tonya Allison Oberst, now his wife Tonya Bishop, travelled from Idaho to the Florida coast to go shopping for a sailboat to live on.  Once in Florida, Tonya had heard about a rally [then President] Trump would be hosting in Washington, D.C. on January 6, 2021.  Various people, including Mr. Bishop's family who were supporters of then President

Donald Trump, discussed the upcoming Trump Rally. Tonya wanted to take advantage of the rare opportunity to hear Donald Trump speak. Mr. Bishop had never been to Washington, D.C. before, so he saw the trip as an opportunity to see the Nation's capital. He also saw it as an opportunity to bond with and show support to his girlfriend, Tonya. Therefore, Mr. Bishop and Tonya headed to D.C., arriving on January 5th. Along the way, they stopped and spent the night in Tennessee to visit one of Mr. Bishop's brothers, then proceeded to D.C. to meet up with Mr. Bishop's parents and Bryan's other brother in D.C. on January 5th.

Later that day, on January 5th, Mr. Bishop and Tonya attended pre-rally speaking events. Trump wasn't there, but people were speaking about the steal rhetoric, Antifa, and BLM [Black Lives Matter]. At one point, someone handed Mr. Bishop a pepper spray can and said, "use it on Antifa if you need to." Bryan kept the pepper spray (which he ended up using). Mr. Bishop recalls being "amped up because of the crowds, and the locals were yelling at us, telling us to go home, and we were crazy." Mr. Bishop recalls his anxiety was pretty high, but nothing happened on January 5th. People were yelling, "we need to support Trump!" and the "My Pillow" guy got up there and said he had proof that the election was stolen. Mr. Bishop was told Antifa was in the crowd trying to incite violence, but he never saw any violence that night. After the pre-rally events, Mr. Bishop and Tonya returned to the hotel.

On January 6, 2021, Mr. Bishop, Tonya and Mr. Bishop's family members walked to the Trump Rally at the National Mall. The President was going to speak around 1 P.M. Mr. Bishop recalls it was really crowded. The crowd was everywhere you could see, standing shoulder to shoulder the whole time. Mr. Bishop also recalls that his regular crowd anxieties were high, but it was colder outside, causing him to hop around to stay warm. According to Mr. Bishop, it took forever for Trump to start his speech; Trump was really late. Once Trump started speaking, Mr.

Bishop wasn't really listening to what Trump had to say but was more focused on the crowd and the snipers he observed on various rooftops.  The Bishop family was near the back of the crowd and had a hard time hearing the various speeches, including Trump's speech.  After the speeches, the family decided to follow the crowd over to the U.S. Capitol.  Mr. Bishop recalls he wasn't expecting a riot, just people waving flags.  When he arrived on the Capitol building grounds, he did not observe any barricades.  People were just going up to the Capitol building.  Mr. Bishop then recalls that the police were firing off ordnance, but at that point, he recalls hearing that somebody was having a heart attack. Mr. Bishop went over to see if he could help, but people were already performing CPR on the man.  At that point, Bryan became separated from Tonya and his family.  He recalls being in this crowd all alone and didn't have any support. He pushed through the crowd to get up on some elevation so he could search for Tonya, his parents, and brothers.  Mr. Bishop grew fairly anxious because of the crowds.  At one point, he heard someone yell that BLM was present.  Mr. Bishop also heard explosions from the flash grenades and the tear gas, "it just reinforced all that… anxiety that there is a threat and to be on guard."

During this chaos, Mr. Bishop's anxiety escalated and he panicked.  It was during this period of irrational panic and hypervigilance that Mr. Bishop spayed the two M.P.D. officers with the pepper spray.  When discussing this unfortunate incident with Dr. Keller, Mr. Bishop stated:

> In the video, I am emotionless; there was no rage or emotion or anything else, but it's all speculation, as I don't remember. I would have never attacked a cop. I have been EMS all my adult life and would have never attacked a cop, so I am wondering what happened right beforehand that led me to do it. All I can say is they looked like Antifa from what I recall from the images I had seen with the vests but without 'police' written on them.

*Keller Rpt.* at p. 14.

From the footage of the incident, Mr. Bishop does not have any facial expressions – he does not appear angry, or happy; nor is he yelling.  He is surprisingly calm but sprays the two officers with pepper spray.  He does not appear to show any emotion as he sprayed the two officers.

Mr. Bishop had no reason to assault the two officers.  Mr. Bishop's conduct was consistent with being in a state of hypervigilance triggered unexpectedly by his PTSD when he became separated from Tonya and his family in the large crowd.

Mr. Bishop was captured on surveillance video for most of the time he was in or around the Capitol.  Other than the one instance where he sprayed the two officers with the pepper spray, at no time while in or around the Capitol was Mr. Bishop captured being violent or destroying property.  It further does not depict him encouraging other protestors to be violent or destroy property.  There is no indication Mr. Bishop had any other confrontations with law enforcement officers or other Capitol personnel.  The various footage shows him walking around looking confused and asking questions—he was looking for Tonya and his family.

After walking around the Capitol looking for Tonya, Mr. Bishop finally found the exit from the Capitol building; fortunately, he met up with Tonya on a patio outside of the Capitol building.  Mr. Bishop, Tonya, and Mr. Bishop's parents then returned to the hotel.

Mr. Bishop did not take any photos or videos the entire day on January 6, nor did he post any photos or videos on social media associated to the events of January 6, 2021.  Mr. Bishop and Tonya departed Washington, D.C. on January 7, 2021.

Prior to January 6, 2021, Mr. Bishop had never participated in a protest.  He is not a member of any militia or other radical groups and does not have any social media accounts. [4]

---

[4] Tonya Bishop opened a Facebook account in July 2021 named "Brian Tonya Bishop".  Although Bryan has access to the account, he never used it.

Tonya Bishop confirmed it was out of character for Mr. Bishop to attend any gathering, let alone a public event, but stated that he had agreed to attend the rally on January 6, 2021, for her benefit. *See Keller Rpt.* at p. 14.

According to Dr. Keller:



*Keller Rpt.* at p. 14-15.

Dr. Keller concluded as follows:

Mr. Bishop is a decorated military veteran whose combined 21 years of service as a Navy Corpsman alongside U.S. Marines and an Air Force Aeromedical Evacuation Technician resulted in the psychological sequelae of 10 deployments, five of which were combat and all involved repeated exposure to the casualties of war.

As mentioned above, Mr. Bishop's history is absent of chronic alcohol use, incidents of physical aggression or violence towards others, and his presence in a crowded event is also a departure from his pattern of avoidant behaviors. Therefore, when considering the constellation of factors that make up his



It is my opinion that it was uncharacteristic of Mr. Bishop to be amongst the rioters at the U.S. Capitol on January 6, 2021, and to have assaulted the two MPD Officers.

### 2. History and Characteristics of the Defendant.

Mr. Bishop is 52 years old and a resident of Florida. Mr. Bishop has no history of arrest or conviction as a juvenile or as an adult, separate from the current conviction. In fact, prior to the instant offense, he has had no past contact with the criminal justice system. PSR at ¶¶ 40-42.

Mr. Bishop was born into the U.S. military service while his parents were stationed in Germany. PSR ¶48. As a result of his father's military service in the United States Army, the Bishop family had relocated between Germany and the U.S. about three times before Mr. Bishop was nine years old. Thereafter, the family remained stateside, but based on his father's military-related relocations, Mr. Bishop attended four to five schools throughout his primary and secondary academic years. *Keller Rpt.* at p. 3. As a result, he never had an opportunity to make life-long friends or form significant bonds with his peers. Mr. Bishop remained in the family home until he was 19 years old when he enlisted in the United States Navy. *Id.*

On June 18, 1991, Mr. Bishop enlisted in the United States Navy. He was stationed at Camp Pendleton, California, where he was assigned to 1st Reconnaissance Battalion as a Field Medical Service Technician. *Keller Rpt.* at p. 4. Throughout his four-year service with the Navy, Mr. Bishop completed two 6-month deployments to Somalia. Mr. Bishop's deployment (1993 to 1994) involved his unit providing a show of military force during the Battle of Mogadishu, and

during his second deployment (1994 to 1995), his unit assisted in the withdrawal of United Nations troops from Somalia.  Mr. Bishop experienced combat during both deployments, but it was during his second deployment that he returned fire to engage the enemy, which also earned him his first Combat Action Ribbon.   Mr. Bishop separated from the U.S. Navy at the rank of Hospital Corpsman Third Class on June 17, 1995, with a characterization of service under Honorable conditions.  *Id.*

Mr. Bishop separated from the U.S. Navy to enlist in the U.S. Air Force and work as a pararescue specialist; and on January 16, 1996, he enlisted in the U.S. Air Force at the rank of E-4 Senior Airman (SrA).  During his para-rescue training, he broke his kneecap, requiring that he transfer his job designation to Aerospace Medical Service, where, for the next four years, he provided medical, emergency, and life-saving services to both active- duty military and civilians. *Id.*

In 1999, Mr. Bishop transferred his job designation to Aeromedical Evacuation Technician and, in 2000, deployed to Macedonia, where he provided medical evacuations.  Over the following 12 years, Mr. Bishop completed eight more deployments.  His deployment history is as follows:

**U.S. Navy**

▪ Somalia 1993-1994 (6 months)
▪ Somalia 1994-1995 (6 months)

**U.S. Air Force**

▪ Macedonia 2000 (1 month)
▪ Kuwait 2001 (4 months)
▪ Qatar 2002 and 2003 (4 months each)
▪ Afghanistan 2005 (4 months)
▪ Afghanistan 2006 (4 months)
▪ Germany 2007 (1 month)
▪ Afghanistan 2010-2011 (9 months)

Throughout Mr. Bishop's military career as combat medic, his professionalism and

dedication to duty was acknowledged through numerous awards and commendations – all of which accredited exceptionally meritorious service, personal courage under enemy fire, and commitment to accomplishments in combat zones under the most extreme of circumstances. Bryan's selfless service and participation in more than 100 combat missions saved the lives of at least 85 American and coalition combatants and civilians. Bryan facilitated, and in many cases led, the medical evacuation of several thousand wounded U.S. and coalition service members from combat zones. During these deployments, Mr. Bishop coordinated combat medical evacuations and provided direct medical care to combat-related injuries.

In 2011, Bryan and his younger brother, Mike, served in Afghanistan together. There, Mike observed first-hand Bryan interacting with his flight crew and other medical professionals. Mike observed that his older brother was respected by his peers whom often requested Bryan Bishop by name for high-risk or difficult missions. His military bearing and focus on serving others was unwavering. *See Exhibit 2* (August 19, 2024 Letter from Michael Bishop).

Mr. Bishop recalled his 2007 deployment to Germany, "We were tasked as the on-board fixed wing aircraft picking up and flying out of theater [war zone] with causalities to Germany; that was the most combat-related injuries [he had witnessed]." He further described that during his 2010-2011 deployment to Afghanistan, he was the assigned medic for the Provincial Reconstruction Team (PRT), whose primary mission was to provide further development (e.g., roads and schools) within the country. "We took quite a bit of fire. We FOBd [stayed at a Forward Operating Base] with the French and patrolled with them. We got to a point when we would do one funeral a month as there were so many dead; otherwise, there would be a funeral every day." Mr. Bishop's military performance report for 2010 to 2011 recognized Mr. Bishop for providing life-saving medical care to military and civilian casualties, some of whom were children who had

sustained severe IED blasts (improvised explosive devices) or battle injuries. During this deployment, Mr. Bishop was awarded the Bronze Star for his heroic service. *Keller Rpt.* at p.5.

Throughout his 17 ½ years of service in the Air Force, Mr. Bishop's leadership recognized him for his selflessness, reliability, professionalism, and consistently performing at a "superior" level for his rank. He was also recognized for his involvement in volunteerism both on base and in the surrounding community. Specifically, in 1996, he volunteered at a youth summer camp while stationed in Germany. Over the years, he taught CPR and medical aid classes, and taught high school students first aid and life-saving skills. Mr. Bishop, after 21 years of combined active-duty service, retired at the rank of Master Sergeant on December 31, 2007, with a characterization of service under Honorable conditions. Mr. Bishop received no disciplinary actions during his enlistments; he did, however, receive positive performance evaluations and numerous awards. *Id.*

In 1995, after separating from the U.S. Navy, Mr. Bishop married his first wife, Christina. They have two children, Liam and Emily, who are 24 and 22 years old, respectively. Mr. Bishop was often absent from the family home due to being deployed or training to deploy. Mr. Bishop acknowledged that when he was not deployed, "[i]t was hard to sit still being home," as he struggled to effectively cope or manage the intrusive thoughts and images of his previous deployments and the anxiety he experienced. *Id.*

Despite his and Christina's marital problems, they remained together throughout his military career and separated in 2013. After retiring from the Air Force, Mr. Bishop lived with his wife and children in Oklahoma until the separation at the end of 2013. *Id.* Their divorce was finalized in 2015. Since that time, Mr. Bishop has had a strained relationship with his children, who live in Oklahoma, which he attributes to Christina portraying him as a father who abandoned his children. *Id.*

After the separation, Mr. Bishop relocated to Minnesota to live near his parents and found employment at a nursing home for a few months before he quit.  "I decided it wasn't for me for a variety of reasons. First, everybody dies in there, and I had enough death and then the politics; it was not for me. I tried to be a truck driver but crashed the truck during a flashback."  *Keller Rpt.* at p.  .  Medical Records indicated that following his retirement from military service, Mr. Bishop had a series of jobs (i.e., nursing home, truck driver, pipefitter, and leather repairman) that he held for a brief period before he quit.  According to Mr. Bishop, "I always end up quitting because of PTSD or physical-related stuff." *Id.*

Mr. Bishop's military service was exemplary and earned him many medals and awards. Listed below are some of the medals that Mr. Bishop earned while defending the United States:

- The USAF Combat Action Medal, which is awarded to recognize airmen and guardians for active participation in ground or air combat.

- The Air Force Outstanding Unit Award with 7 Oak Leaf Clusters, indicating outstanding performance by his unit.

- The Air Force Good Conduct Medal with 5 Oak Leaf Clusters, which signifies continuous good conduct for a period of 3 years.

- The Air Force Recognition Ribbon, which recognizes superior actions over a period  of time or an individual action.

- The National Defense Service Medal with 1 Service Star, which is awarded to every member of the U.S. Armed Forces who served during specified periods of armed conflict or national emergency.

- The Armed Forces Expeditionary Medal with 1 Service Star, which is given to members of the U.S. Armed Forces who participated in U.S. military operations or operations in support of friendly foreign nations.

- The Afghanistan Campaign Medal, which is awarded for duty performed within the borders of Afghanistan for a specified period of time.

- Recognized with the Global War on Terrorism Expeditionary Medal and the Global War on Terrorism Service Medal, which both acknowledge his deployment and support of operations to counter terrorism.

- The Air Force Overseas Ribbon Short tour, which recognizes his military tours outside the United States.

- The Air Force Expeditionary Service Ribbon with Gold Border and 1 Oak Leaf Cluster, indicating completion of a standard contingency deployment.

- The Air Force Longevity Service with 4 Oak Leaf Clusters, denoting his years of military service.

- The USAF NCO PME Graduate Ribbon with 1 Oak Leaf Cluster, which signifies his completion of Non-Commissioned Officer Professional Military Education.

- The Small Arms Expert Marksmanship (pistol) badge, indicating his proficiency in pistol marksmanship.

- The Air Force Training Ribbon, which recognizes his completion of basic military specialty training.

- The NATO Medal with Service Star, which is given for service with the North Atlantic Treaty Organization.

- The Bronze Star, which is given for heroic achievement, heroic service, meritorious achievement, or meritorious service in a combat zone.

- The Meritorious Service Medal, which recognizes acts of meritorious service and sometimes gallantry.

- The Air Medal with 3 Oak Leaf Clusters, indicating that he has demonstrated single acts of heroism or meritorious achievement while participating in aerial flight on multiple occasions.

- The Joint Service Commendation Medal, which is awarded by the Secretary of Defense to members of the Armed Forces who have distinguished themselves by meritorious achievement or service in a joint duty capacity.

- The Air Force Achievement Medal with 1 Oak Leaf Cluster, which recognizes outstanding achievement or meritorious service of military personnel who were not eligible to receive higher commendation medals.

In addition to the above awards and decorations, Mr. Bishop has also achieved various military badges, including the US Navy Diver Badge, Parachute Badge, Air Force Flight Medic

Wings, Senior medic 4NO71 Badge, and US Army Combat Action Badge.  These badges signify his completion of specific training programs and his involvement in combat activities with the respective branches of the military.  Overall, Bryan Bishop's consistent pattern of awards and decorations demonstrates his exceptional service, achievements, and dedication throughout his military career.

All of the above awards and medals Mr. Bishop received came at a tremendous personal cost and sacrifice.  Mr. Bishop lost his first wife to divorce and became estranged from his children, who felt abandoned due to his many military deployments.  More profoundly, during his service in the U.S. military, particularly during his ten combat tours, Mr. Bishop witnessed and endured experiences that no one should ever have to face—scraping body parts from the ground after they were crushed by a tank, collecting limbs blown away by IEDs, performing field amputations, recovering charred bodies of soldiers and children after explosions, and even sitting on dead bodies while attempting to save the lives of those who survived.

Throughout his military enlistment, Mr. Bishop sustained several concussions either from a direct head injury (i.e., hitting his head during a fall) or the concussive force of blast exposures (i.e., IEDs).  He experienced disorientation or a brief (less than five minutes) loss of consciousness, followed by headaches and memory impairment.  However, medical care or further assessment was not sought because, "I just had to press on, as I was the only medic."  Mr. Bishop continues to experience a mild headache about every two weeks, has light sensitivity, and has significant memory impairment.  Specifically, he struggles to retain new information and often relies on his wife, Tonya, for assistance with many daily activities, including medication and appointment adherence.  *Keller Rpt. at p.6.*

Mr. Bishop explained that following his deployments to Somalia, he began experiencing anxiety and occasional nightmares of "Dead kids and stuff that I had seen," but dismissed his symptoms as he wanted to join the Air Force to continue fighting for his country.

Following his 2000 deployment and continual exposure to medical traumas, Mr. Bishop began experiencing frequent anxiety, hypervigilance, and flashbacks about deployment-related incidents.

Mr. Bishop stated that it was not uncommon for him to get sprayed with blood. He recalled his experiences with the KIA [killed in action] soldiers and the wounded soldiers—when there was not enough room, and you ended up sitting on the KIA as a seat while you were working on the living guy. During the medevacs [medical evacuations], he had a lot more flashbacks, hypervigilance, and anxiety. It was accepted in the war zone theaters but would remain when he went back to the States. Mr. Bishop would have panic attacks, flashbacks, and startle very easily. It was very difficult to concentrate and focus on his job or be motivated to do anything for anybody else. He felt comfortable in the war theater because it was normal to act that way; he figured that is why he went on so many deployments. *Keller Rpt.* at p.6.

Mr. Bishop reported that over the years, he has continued to experience anxiety, panic attacks, flashbacks, and intrusive thoughts about deployment-related incidents that come about unexpectedly or are triggered by external events (e.g., sudden loud noises, large crowds, or unfamiliar situations). "Literally, it's a flash of blood and guts and a memory that won't go away. Like fireworks, it's not so much that I then have a flashback but a disorientation that triggers memories and feelings of being in combat. I smell death just about daily—I do nothing, just go about my day, or I take a shower." Mr. Bishop elaborated further, stating that when he becomes

triggered, he experiences ████████████████████████████████████
█████████████████████████████████████████████

Mr. Bishop has continued to experience episodes of insomnia, and when he can sleep, he experiences nightmares that often contain "blood and guts and gore or loss of a family member." He reported significant fluctuations in mood whereby he consistently feels anxious with an underlying depressed mood that has fluctuated in level of severity over the years. ████████



When Mr. Bishop voluntarily enlisted into the military at 19, he did not have PTSD, TBI, or hearing loss.  After 21 years of heroic military service, he is now haunted and tormented by the sights, sounds and smells of war.  On January 6th, something in the chaos and large crowd triggered Mr. Bishop's PTSD and sent him into a state of hypervigilance.  Tragically, he harmed two police

---

[5] *See* Dr. Keller report concerning various mental health issues and observations.

officers, and now his freedom is on the line for his actions.  It is ironic that Mr. Bishop developed his mental health issues as a result of protecting our freedom in the United States.

**Dr. Shauna Keller's Report**



3.      *Seriousness of the offense, respect for the law, and just punishment.*

As stated herein, Mr. Bishop fully admits that the offense he committed is extremely serious.  He wants to personally apologize to M.P.D. Offers A.A. and B.S. and ask for their forgiveness.  However, counsel submits that Mr. Bishop's actions do not represent his true character.  As a trained medic, Mr. Bishop is typically someone who helps those in need, rather than causing harm.  Additionally, Mr. Bishop has no relevant criminal history, juvenile history, or disciplinary history of any kind while in the military, as indicated by a criminal history score of zero in his Presentence Report. PSR ¶¶ 40-46.  Further, Mr. Bishop remained on his personal recognizance without issue in the instant case, reflecting a clear respect for the law.  Further, the Court has released Mr. Bishop on personal recognizance awaiting sentencing, and he has complied with every condition imposed on him. PSR ¶ 11-12.

4.      *Deterrence to criminal conduct and protection from further crimes.*

As stated herein, Mr. Bishop has no relevant criminal history.  The unique nature of the events of January 6, 2021 demonstrate that Mr. Bishop is not at any risk of participating in future

illegal conduct.  Mr. Bishop has already faced the consequences of his actions.  As a convicted

felon, he can no longer go to the VA Hospitals located on restricted military bases for his mental

health treatments.  He can no longer use the commissary on military bases because he is a convicted

felon.  If he is imprisoned for more than 60 days, his VA benefits are reduced to 10%.  He will

lose 90% of his benefits while incarcerated.  He has already lost military privileges that took him

21 years to earn.  As such, there is no need for deterrence or protection from further crimes that

need to be factored into Mr. Bishop's sentence.  The court will never hear from Mr. Bishop again.

**5.    Need for treatment and training.**

 Mr. Bishop is an occasional

drinker.  PSR ¶ 65.  Mr. Bishop experimented with marijuana but stopped because it made him

paranoid ███████████████  Beyond that, Mr. Bishop has not used any illicit substances.

PSR ¶ 66.

**6.    Sentences available.**

The offense of conviction ("Assaulting, resisting, or impeding certain officers or

employees" in violation of 18 U.S.C. § 111(a)(1)) exposes Mr. Bishop to a maximum fine of

$250,000 or not more than eight (8) years of imprisonment, or both.

Taking into account Mr. Bishop's history and characteristics, in combination with the facts

of the offense, a sentence of eighteen months of home detention with community service, followed

by two years of supervised release would (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; and (5) protect the public from further crimes of the defendant.

Here, there are mitigating factors that contributed to Mr. Bishop's conduct, which is well documented in Keller's Report.  Mr. Bishop's medical issues, for which he is currently on 100% disability, pre-dates the events of January 6th.  Mr. Bishop can be best served by the programs available at the VA.

It is Mr. Bishop's position that a variance is appropriate here based upon these factors. *See* 18 U.S.C. §3553(b)(1) ("the court shall impose a sentence of the kind, and within the range…unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing commission").

Mr. Bishop's ███████████████, directly resulting from his extensive combat service, significantly impaired his judgment and impulse control on January 6th when he was separated from Tonya and his family.  PTSD and TBI played a crucial role in his involvement in the January 6th events, which he would not have participated in under normal circumstances.

The focus should be on rehabilitation rather than incarceration.  A sentence of incarceration may exacerbate Mr. Bishop's ██████ issues at a time he is making improvements, whereas a structured, treatment-focused environment could address the underlying causes of Mr. Bishop's behavior.  Counsel strongly recommends alternatives to prison, such as ████████████████████████████████, and supervised release with mandatory counseling, as more effective in helping Mr. Bishop and preventing future incidents.

Addressing Mr. Bishop's ███████ issues is essential to preventing future misconduct, further reinforcing the need for a treatment-focused, rather than punitive, approach to address his actions on January 6th. If the Court were to impose a sentence of imprisonment for Mr. Bishop, such a sentence would cause a substantial, direct, and specific disruption to his current ███████ program. He needs continuity and support from Tonya, his family, and fellow veterans. If the Court were to sentence Mr. Bishop to home detention, there would be no disruption of his care and, thus, would address his ███████ issues while still punishing him for his actions on January 6th.

Should the Court consider any prison time as a necessary punishment for this offense, Mr. Bishop respectfully requests that the sentence be as minimal as possible, and request that the Court make a strong recommendation to BOP that Mr. Bishop be allowed to serve his sentence at FCI Butner in North Carolina. FCI Butner has programs which comes closest to addressing Mr. Bishop's current ███████ issues.

### *The Need to Avoid Unwarranted Sentence Disparities Among Defendants/ Due Regard for Relationship of the Sentence to Prescribed Guidelines Applicable to Similar Offenses and Offenders (18 U.S.C. §3553(a)(6) and (b)(1))*

To date, forty-six (46) defendants who pled guilty to one count of violation of 18 U.S.C. § 111(a)(1) in relation to the events of January 6, 2021 have been sentenced. The following is a summary of those who pleaded guilty to assaulting, resisting, or impeding law enforcement officers, and the sentences imposed.

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Creek, Kevin | 1:21-CR-00645-DLF | 18 U.S.C. § 111(a)(1) | 27 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 27 months' incarceration<br>12 months' supervised release<br>$2,000 restitution |
| Leffingwell, Mark | 1:21-CR-00005-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration | 6 months' incarceration |

| | | | | |
|---|---|---|---|---|
| | | | 36 months' supervised release $2,000 restitution | 24 months' supervised release 200 hours' community service $2,000 restitution |
| Mattice, Cody | 1:21-CR-00657-BAH | 18 U.S.C. § 111(a)(1) | 44 months' incarceration 36 months' supervised release $2,000 restitution | 44 months' incarceration 36 months' supervised release $2,000 restitution |
| Mault, James | 1:21-CR-00657-BAH | 18 U.S.C. § 111(a)(1) | 44 months' incarceration 36 months' supervised release $2,000 restitution | 44 months' incarceration 36 months' supervised release $2,000 restitution |
| Willden, Ricky | 1:21-CR-00423-RC | 18 U.S.C. § 111(a)(1) | 30 months' incarceration 36 months' supervised release | 24 months' incarceration 36 months' release |
| Richardson, Howard | 1:21-CR-00721-CKK | 18 U.S.C. § 111(a)(1) | 46 months' incarceration 36 months' supervised release $2,000 restitution | 46 months' incarceration 36 months' probation $2,000 restitution |
| Young, Kyle | 1:21-CR-00291-ABJ | 18 U.S.C. § 111(a)(1) | 86 months' incarceration 36 months' supervised release $2,000 restitution | 86 months' incarceration 36 months' supervised release 100 hours' community service $2,000 restitution |
| Head, Albuquerque Cosper | 1:21-CR-00291-ABJ | 18 U.S.C. § 111(a)(1) | 96 months' incarceration 36 months' supervised release $2,000 restitution | 90 months' incarceration 36 months' supervised release $2,000 restitution |
| McGrew, James | 1:21-CR-00398-BAH | 18 U.S.C. § 111(a)(1) | 78 months' incarceration 36 months' supervised release $2,000 restitution | 78 months' incarceration 36 months' supervised release $5,000 fine $2,000 restitution |
| Dickinson, Michael | 1:21-CR-00649-JDB | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release | 20 months' incarceration 36 months' supervised release |

| | | | $2,000 restitution | $2,000 restitution |
|---|---|---|---|---|
| Eckerman, Michael | 1:21-CR-00623-CRC | 18 U.S.C. § 111(a)(1) | 24 months' incarceration 36 months' supervised release $2,000 restitution | 20 months' incarceration 24 months' supervised release $2,000 restitution |
| Copeland, Landon | 1:21-CR-00570-APM | 18 U.S.C. § 111(a)(1) | 52 months' incarceration 36 months' supervised release | 36 months' incarceration 36 months' supervised release |
| Shively, Barton Wade | 1:21-CR-00151-JMC | 18 U.S.C. § 111(a)(1) | 37 months' incarceration 36 months' supervised release $2,000 restitution | 18 months' incarceration 36 months' supervised release $2,000 restitution |
| Slye, Mikhael | 1:22-CR-334-JEB | 18 U.S.C. § 111(a)(1) | 57 months' incarceration 36 months' supervised release $2,000 restitution | 30 months' incarceration 18 months' probation $2,000 restitution |
| Elliott, James Robert | 1:21-CR-00735-RCL | 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution | 37 months' incarceration 24 months' supervised release $2,000 restitution |
| Clayton, Cale | 1:22-CR-00139-RCL | 18 U.S.C. § 111(a)(1) | 33 months' incarceration 36 months' supervised release $2,000 restitution | 30 months' incarceration 24 months' supervised release |
| McNamara, James | 1:23-CR-00119-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' 24 months' supervised release $2,000 restitution incarceration | 12 months' incarceration 24 months' supervised release $2,000 restitution |
| Leyden, Joseph | 1:22-CR-00314-TNM | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 6 months' incarceration 12 months' supervised release 40 hours' community service $2,000 restitution |
| Vassallo, Salvatore | 1:22-CR-00325-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 24 months' supervised release $2,000 restitution | 18 months' incarceration 36 months' supervised release $2,000 restitution |

| Lockwood, Michael | 1:23-CR-00146-RDM | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 12 months' and 1 day incarceration 36 months' supervised release $2,000 restitution |
|---|---|---|---|---|
| Dillard, Kaleb | 1:23-CR-00049-JMC | 18 U.S.C. 111(a)(1) | 18 months' incarceration 36 months' supervised release $36,238 restitution | 10 months' incarceration 12 months' supervised release $5,500 fine $36,238.55 restitution |
| Russell, Bobby | 1:23-CR-00029-APM | 18 U.S.C. §111(a)(1) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 12 months' & 1 day incarceration 24 months' supervised release 6 months' home detention 250 hours' community service $2,000 fine |
| Buteau, Jaime | 1:21-CR-00489-RDM | 18 U.S.C. § 111(a)(1) | 42 months' incarceration 36 months' supervised release $2,000 restitution | 22 months' incarceration 24 months' supervised release $2,000 restitution |
| Johnson, Zachary | 1:22-CR-00011-RJL | 18 U.S.C. § 111(a)(1) | 50 months' incarceration 36 months' supervised release $2,000 restitution | 42 months' incarceration 36 months' supervised release $2,000 restitution |
| Herrington, Dillion | 1:23-CR-00199-BAH | 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution | 37 months' incarceration 36 months' supervised release $2,000 restitution |
| Adams, Justin Dee | 1:22-CR-00350-JEB | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 17 months' incarceration 12 months' supervised release $2,000 restitution |
| Swoope, Ryan | 1:23-CR-00020-TNM | 18 U.S.C. § 111(a)(1) | 57 months' incarceration 36 months' supervised release $2,000 restitution | 51 months' incarceration 24 months' probation $2,000 restitution |

| Grace, Jonathan | 1:23-CR-00138-RBW | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 24 months' incarceration 36 months' supervised release $5,000 fine $2,000 restitution |
|---|---|---|---|---|
| Kasper, Riley | 1:22-CR-00148-RCL | 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution | 37 months' incarceration 24 months' supervised release $2,000 restitution |
| Miles, Steven | 1:22-CR-00136-JMC | 18 U.S.C. § 111(a)(1) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 24 months' incarceration 12 months' supervised release $2,000 restitution |
| Farris, Jason | 1:23-CR-00068-AMJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 18 months' incarceration 24 months' supervised release $2,000 restitution |
| Mackrell, Clifford | 1:21-CR-00276-CKK | 18 U.S.C. § 111(a)(1) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 27 months' incarceration 24 months' supervised release |
| Mackrell, Michael | 1:21-CR-00276-CKK | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 27 months' incarceration 12 months' supervised release $2,000 restitution |
| Jackson, Adam | 1:22-CR-00230-RC | 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution | 52 weeks' intermittent confinement 52 weeks' home detention 36 months' probation $4,392 fine $2,000 restitution |
| Portlock, Joshua | 1:22-CR-00067-CJN | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 20 months' incarceration 24 months' supervised release $2,000 restitution |
| Brackley, Matthew | 1:24-CR-00009-CJN | 18 U.S.C. § 111(a)(1) | 28 months' incarceration 36 months' supervised release | 15 months' incarceration 24 months' supervised release $1,000 fine |

| | | | | $2,000 restitution |
|---|---|---|---|---|
| Huttle, Dale | 1:22-CR-00403-CRC | 18 U.S.C. § 111(a)(1), (b)(1)(A) | 85 months' incarceration 36 months' supervised release | 30 months' incarceration 24 months' supervised release. $3,639 restitution |
| McNulty, Devin | 1:23-CR-0235-TSC | 18 U.S.C. § 111(a)(1) | 24 months' incarceration 36 months' supervised release $2,000 fine | 12 months and one day' incarceration 24 months' supervised release 60 hours' community service $2,000 fine |
| **Keen, Quinn** | 1:23-CR-0226-TJK | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 24 months' incarceration 24 months' supervised release $2,000 restitution |
| Cholod, Raymond | 1:23-CR-00185-APM | 18 U.S.C. § 111(a)(1) | 46 months' incarceration 36 months' supervised release $2,000 restitution | 40 months' incarceration 36 months' supervised release |
| Tate, Curtis Logan | 1:24-CR-00092-CRC | 18 U.S.C. §§ 111(a)(1) | 78 months' incarceration 36 months' supervised release $3,176 restitution | 63 months' incarceration 36 months' supervised release $3,176 restitution |
| Schubert, John Anthony | 1:24-CR-00077-CRC | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 18 months' incarceration 24 months' supervised release $2,000 restitution |
| Casselman, Thomas | 1:24-CR-0111-DLF | 18 U.S.C. § 111(a)(1) | 40 months' incarceration 36 months' supervised release $2,000 restitution | 40 months' incarceration 36 months' supervised release $2,000 restitution |
| Cook, Steven | 1:23-CR-00340-TNM | 18 U.S.C. § 111(a)(1) | 37 months' incarceration 36 months' supervised release $2,000 restitution | 28 months' incarceration 36 months' supervised release $2,000 restitution |

| | | | | |
|---|---|---|---|---|
| Yetman, Gregory | 1:24-CR-00093-JEB | 18 U.S.C. § 111(a)(1) | 45 months' incarceration 36 months' supervised release $2,000 restitution | 30 months' incarceration 18 months' supervised release $2,000 restitution |
| Jackson, Brian | 1:22-CR-00230-RC | 18 U.S.C. §111(a)(1) | 52 months' incarceration 36 months' supervised release $2,000 restitution | 37 months' incarceration 36 months' supervised release 60 hours' community service $2,000 restitution |

**Kevin Creek**, 47, a former Marine from Georgia who admitted to assaulting two police officers during the Jan. 6 attack on the U.S. Capitol.  Video shows Creek reaching over a bike rack-turned-barricade and grabbing an officer's face shield.  He later struck that officer with his right hand before, according to prosecutors, "driving him backward forcefully several feet."  Video footage also showed Creek kicking a police officer who was holding up a shield to protect himself.  According to court documents, Creek was carrying mace and a boot knife at the time of the attack, although he was not charged with using them during his confrontation with police.

**Mark Leffingwell**, 52, a disabled Iraq War veteran pleaded guilty to one count of assaulting, resisting, or impeding police officers.  He faced off against police inside the Capitol building as officers struggled to hold off the mob, and when the officers made a move to physically push Leffingwell and others out of the building, Leffingwell struck back.  He first punched Capitol Police Officer D. A. in the head and then punched officer W. H. also in the head.  He was sentenced to six months in jail – a shorter sentence than others who were convicted of assault in the Capitol breach matter.  At Leffingwell's sentencing hearing, Judge Amy Berman Jackson said that Leffingwell was one of the most difficult sentencing decisions she has faced.  Judge Jackson acknowledged Leffingwell's military service, noting that he is a "decorated veteran" who served

twice: after an honorable discharge, he later re-enlisted to join the war in Iraq, where he suffered a traumatic brain injury.

**James Mault** and **Cody Mattice** both pleaded guilty to one count of assaulting, resisting, or impeding a federal officer or employee.  The plea agreement in their case was limited to between 37 and 46 months in prison.  They both were sentenced to 44 months of incarceration, with 36 months of supervision following their respective releases.  In addition, the two were both ordered to pay "special assessment" fines of $100 each, and $2000 each in restitutions to the architects of the Capitol.  According to Chief Judge Beryl Howell, who sentenced the defendants, indicated that the two defendants were at the front of the line during the attacks, and among the first to enter the Capitol building, "directly participating in violence."  According to court documents, Mault and Mattice began planning their trip to the Capitol on January 2, 2021.  Mault bought pepper spray and a baton for Mattice, along with a high-powered fire extinguisher he said in text messages could be used to repel crowds.  On January 6, Mattice recorded a video of himself blocks away from the Capitol saying, "It's about to be nuts."  Mault tried to convince police in D.C. to abandon their posts and join the mob.  Mault and Mattice were each seen on video spraying a chemical spray at police gathered in a tunnel leading into the Capitol Building.  Mault also gave a canister of chemical spray to another rioter on the scene.  Mault argued that his prior military service should warrant a lower sentence.  The government disagreed.

**Ricky C. Willden**, 41, was sentenced to 24 months' incarceration for assaulting law enforcement officers during the Jan. 6, 2021, Capitol breach.  According to court documents, on Jan. 6, 2021, at approximately 2:35 p.m., Willden raised a small green cannister and sprayed U.S. Capitol Police officers with a chemical irritant.  After spraying the irritant, he threw the cannister at the officers.  Willden entered the Capitol Building at approximately 3:02 p.m. and

remained inside for approximately 18 minutes.  Willden later posted to Facebook, "I think they got the message from everyone of all ages."  He pleaded guilty on April 7, 2022, to assaulting, resisting, or impeding law enforcement officers.  Following his prison term, he will be placed on three years of supervised release.  Willden also must pay $2,000 in restitution.

**Howard C. Richardson**, 72, was sentenced to 46 months in prison for assaulting law enforcement officers during the breach of the U.S. Capitol on Jan. 6, 2021.  According to court documents, on Jan. 6, 2021, Richardson made his way to the restricted area of the U.S. Capitol grounds, passing by metal barriers and police officers attempting to keep the crowd away.  He was carrying a flagpole that he initially waved while he was among the crowd.  At about 1:38 p.m., Richardson was standing several feet away from the police line at the West Terrace with the flagpole.  He raised it and forcefully swung it downward to strike an officer with the Metropolitan Police Department who was standing behind a metal barricade.  Richardson then struck the officer two more times, using enough force to break the flagpole.  Then, moments later, he joined other rioters in pushing a large metal sign into a line of law enforcement officers.

**Kyle Young**, 38, was sentenced to 86 months in prison for assaulting a law enforcement officer during the breach of the U.S. Capitol on Jan. 6, 2021.  According to court documents, Young was among a mob of people participating in the assault of law enforcement officers in the Lower West Terrace of the Capitol and the Archway that leads into the building.  A group of officers from the U.S. Capitol Police and Metropolitan Police Department (MPD) formed a line at the door to prevent the mob from entering.  At around 2:54 p.m., Young joined the rioters who were pushing against the police line.  While in the tunnel area beneath the Archway, he held a strobe light toward the police line and pushed forward a stick-like object.  He assisted in throwing a large audio speaker toward the police line.  As officers began to push the mob back

from the doors around 3:18 p.m., another rioter pulled a Metropolitan Police Department officer through the tunnel and into the crowd outside.  The MPD officer – wearing a uniform, marked helmet and tactical vest – was assaulted while he was in the mob by rioters, including Young. Young held the officer's left wrist and pulled the officer's arm away from his body.  The MPD officer was then swept further in the crowd.  He was rendered momentarily helpless when an individual repeatedly applied a taser to the back of his neck.  According to court documents, as the violence continued in the Lower West Terrace area, Young also made contact with the helmet of a Capitol Police Officer who was pulled into the crowd.

**Albuquerque Cosper Head, 43,** was sentenced to 90 months in prison for assaulting former Washington, DC, Metropolitan Police officer Michael Fanone and dragging him into the crowd of violent rioters on January 6, 2021, yelling "I got one!" during the breach of the U.S. Capitol on Jan. 6, 2021.  In the lower west terrace tunnel, a small entryway into the Capitol, the mob fought police with chemical spray, poles, bats, and officers' own batons and shields against the line of police – including Officer Michael Fanone – protecting the building and those inside. According to court documents, it was during this incident when Albuquerque Head pulled Fanone away from his fellow officers, wrapping his arm around Fanone's neck and tearing him into the crowd, which consumed Fanone and beat him unconscious.  During the sentencing hearing, prosecutors played video from Fanone's body-worn camera on January 6, which showed Mr. Head initially tell Officer Fanone, "I'm going to get you out of here."  Fanone replied, "Thank you."  Fanone testified during the sentencing that at first, he believed Head was trying to help him.  Seconds later, however, Head yelled "I got one!" to the mob.  Officer Fanone testified he felt Head "choke me and drag me out into the vicious crowd," holding onto Fanone as another rioter tased him.  Some in the crowd tried to strip Officer Fanone of his service weapon as one

rioter threatened to kill him with his own gun.  The officer suffered a heart attack as rioters beat

him and tased him in his neck repeatedly, Fanone said.

**James McGrew**, 40, was sentenced to 78 months in prison, 36 months of supervised

release and ordered to pay $2000 in restitution after he pleaded guilty to assaulting, resisting, or

impeding police officers.  McGrew committed the assault while on probation for another matter.

According to court records, McGrew is seen aggressively approaching law-enforcement officers,

the FBI criminal complaint said, while yelling statements like, "we're coming in here, whether

you like it or not" and "fight with us, not against us."  According to court documents, during the

riots, McGrew pushed and struck police officers and launched a wooden handrail with metal

brackets toward officers.  Judge Howell said that the evidence showed that McGrew was not just

a bystander or passive participant at the U.S. Capitol building that day, along with thousands of

other Trump supporters looking to stop the certification of the results of the 2020 presidential

election, but that he was a major agitator.  Government filings allege that McGrew can be seen

on video yelling things like "Four more years," "Let's go, we need more people," and "Come on,

come on" at various locations around and in the Capitol building. He was also heard saying to

law enforcement: "Y'all are with us, not against us.  They want to defund the police, you know

that right? They are going to take your fucking job from you and you're fucking defending

them."  He also repeatedly called the officers traitors and said there were two million people

outside fighting to get into the building.  At one point, the government said, McGrew filmed

police officers on his phone, shouting their badge numbers and their names, after yelling at them

things like "We're coming in here, whether you like it or not."  Judge Howell said, "He assumed

a leadership position in that. He engaged in not just verbal altercations with law enforcement, but

physically tried to break up police lines, and tried to lead others to join him in breaking police

lines, to break into the Capitol for whatever his political aims were that day."

**Michael J. Dickinson**, 31, was sentenced to 20 months in prison, followed by 36 months of supervised release, and restitution of $2,000. Dickinson pleaded guilty to assaulting, resisting, or impeding law enforcement officers.  According to court documents, on Jan. 6, 2021, Dickinson joined a mob illegally gathered outside the north side of the Capitol Building.  A line of law enforcement officers stood between the rioters and the building to prevent the mob from getting inside.  At approximately 3:06 p.m., Dickinson quickly walked to the front of the crowd and threw what appeared to be a coffee tumbler at the officers.  The tumbler struck one officer in the face and chest.  The tumbler then bounced off that officer and struck another officer.  Later that afternoon, in a separate incident, Dickinson picked up a bucket filled with an unknown liquid and dumped the liquid on officers.

**Michael Eckerman,** 38, was sentenced to 20 months in prison for assaulting, resisting, or impeding law enforcement officers.  In addition to the prison term, U.S. District Court Judge Christopher R. Cooper ordered 24 months of supervised release and $2,000 in restitution.  According to court documents, on Jan. 6, 2021, Eckerman illegally entered the Capitol grounds.  At approximately 2 p.m., Eckerman observed rioters fighting with police officers outside the Capitol and encouraged them by yelling at the officers that they were "traitors to the country."  He and others then walked through scaffolding and up a set of steps leading to the Upper West Terrace.  He entered the Capitol through the Senate Wing Doors at approximately 2:24 p.m.  While inside the building, Eckerman participated in three separate breaches of police lines.  First, he joined a crowd in pushing their collective bodies forward to breach a police line in the Crypt.  Eckerman and others then surged forward and funneled toward the east side of the Capitol.  Second, near the Memorial Doors, he and others in the mob encountered another small group of

officers who were trying to block access to nearby stairs leading to Statuary Hall and the area near the Speaker's Lobby.  Eckerman pushed his way to the front of the stand-off and once again used his body as part of a collective surge to get past the small line of law enforcement officers. At this moment, he was face to face with an officer with the U.S. Capitol Police, who put his hand on Eckerman's shoulder.  Eckerman pushed the officer—forcibly resisting, impeding, and interfering with the officer—which, along with the actions of others in the mob, caused the officer to stumble down some steps, leaving the officer vulnerable.  While that officer was on the ground, another rioter sprayed him with a fire extinguisher.  Eckerman participated in a third physical breach of a police line just outside the House chamber, at a time Congresspeople and staff members were still sheltering in place inside.  After that third breach, Eckerman continued moving through the building, and at one point entered the Rayburn Conference Room, where he posed for photographs.  He finally exited the Capitol at approximately 2:44 p.m.

**Landon K. Copeland**, 34, was sentenced to 36 months in prison for assaulting, resisting, or impeding officers.  In addition to the prison term, U.S. District Court Judge Amit P. Mehta ordered 36 months of supervised release and a fine/restitution of $2,000.  According to court documents, Copeland was part of a group of rioters illegally gathered at approximately 1:11 p.m. on Jan. 6 on the West Plaza of the Capitol grounds, a restricted area.  While there, another rioter approached a Capitol Police officer and placed his hands around the officer's collar or neck. From behind, Copeland pushed that other rioter, and the officer fell to the ground.  The officer sustained injuries to his knee, back, and hip during his defense of the Capitol on Jan. 6, and attributes some of these injuries to this incident.  Immediately after the officer fell to the ground, other officers came to his assistance.  Copeland grabbed a riot shield belonging to one officer and pushed against the police line.  He grabbed another officer's jacket and grappled with that

officer, pushing the officer backward.  Then he lowered his body to block other officers as they attempted to control the crowd.  As these assaults continued, MPD officers arrived to assist. MPD officers began placing metal bike rack-style barricades across the West Plaza in an effort to establish a perimeter around the Capitol Building.  At approximately 1:14 p.m., another rioter grabbed one of these barricades, pulling it away from an MPD officer standing with it.  Copeland and other rioters joined in a tug of war with officers who attempted to reclaim the barricade.  As events continued, chemical spray was deployed against members of the crowd.  Copeland then charged officers with the barricade, pushing and throwing it into multiple officers.

**Barton Wade Shively** was sentenced to 18 months in prison for two counts of assaulting, resisting, or impeding law enforcement officers, followed by 36 months of supervised release, and was ordered to pay a $2,000 in restitution.  According to court documents, on Jan. 6, Shively attended a rally at the Ellipse and then walked to the U.S. Capitol, where he unlawfully entered the grounds.  He got past broken-down police barriers and went up the steps of the Capitol. While there, Shively assaulted one officer by striking the officer's hand, and head and shoulder areas.  He also assaulted another officer, grabbing the officer's jacket and yelling at the officer.

**Mikhail E Slye**, 32, was sentenced to 30 months in prison, 18 months supervised release, and ordered to pay $2,000 of restitution.  Slye pleaded guilty in January 2023 to one charge of assaulting, resisting, or impeding law enforcement officers.  According to court documents, on Jan. 6, 2021, Slye joined the mob storming the U.S. Capitol and entered the building through a broken window near the Senate wing door while wearing a baseball helmet with a facemask. Slye exited the building a short time later, but then reentered within minutes and traveled to the Crypt area of the Capitol and remained inside for 30 minutes.  After exiting the U.S. Capitol, court records state that Slye went to the north side of the building and observed police using

chemical spray to keep a mob away from the north doors.  As a group of officers made their way down the steps just outside those doors, Slye grabbed a bicycle rack barricade and waited for the officers to come down the stairs.  As a Capitol Police officer approached his position, court documents state that Slye threw the barricade into the officer's path, causing at least one officer to trip over it.  The officer suffered physical injuries as a direct result of the fall.  After Slye tripped the officer, he berated other officers attempting to reenter the U.S. Capitol building, shouting "traitor," "this is our country," "f*** you," "Nazis," "f***ing bitches" and spat at the police.

**James Robert Elliot**, 25, was sentenced to 37 months in prison, 24 months of supervised release, and ordered him to pay $2,000 in restitution to the Architect of the Capitol.  Prosecutors said Elliot urged others in the crowd to cross over barricades outside the Capitol, leading chants of "Whose House? Our house!" before he swung a flagpole at officers, and then thrust it into a police line, making contact with an officer, while repeatedly mimicking a war cry from the movie "300," yelling, "Patriots, what is our occupation? AAH-OOH, AAH-OOH, AAH-OOH." Elliott wore a helmet, goggles, a ballistic vest, hard-knuckle gloves, a radio, and a Thor's hammer pendant.  Prosecutors said Elliot later bragged about his role in the riot, sending a text message stating, "We took the f***ing capital lol," and "I bonked two cops…. Never thought I'd say that."  Elliott also sent texts claiming he was promoted to a high rank among the Proud Boys, writing, "PB is calling me lord Jimbob and s***, and I'm getting nominated for a 4th degree."

**Cale Douglas Clayton**, 42, was sentenced to 30 months in prison, 24 months of supervised release, and ordered to pay $2,000 in restitution to the Architect of the Capitol.[6] According to court documents, on Jan. 6, 2021, Clayton traveled to Washington, D.C., to attend

---

[6] Mr. Clayton pled guilty to two counts.

a rally and afterward walked to the north side of the Capitol building.  At approximately 4:15 p.m., Clayton was present at the upper west terrace as law enforcement began to clear the area and protestors began to clash with police.  While protestors were pushing against police, Clayton picked up a police baton that had been dropped by an officer.  Clayton then forcibly grabbed a riot shield held by a police officer.  Later, at approximately 4:28 p.m., Clayton made his way to another confrontation between police and protestors.  At this time, police attempted to recover the baton from Clayton.  In response, Clayton forcibly made contact with a police officer by grabbing the face shield of the officer's helmet and pushing the officer backward.  "We are going to win," Clayton allegedly bellowed during the siege of the Capitol.  "You don't have enough for all of us. You might hit me once or twice. You might spray me with pepper spray. I don't give a fuck. There ain't enough for millions of people here and you know it."  Clayton allegedly told authorities that they defied former President Donald Trump by defending the U.S. Capitol from the advancing horde of his supporters.  "You guys realize your President told us to be here," Clayton is quoted as having said, "Your President! Hey, how does that make you feel? You're defying your own fucking country."  "Your fucking president told us to be here," Clayton allegedly shouted.  "You should be on this side, right here, going with us.  You are an American citizen.  Your fucking President told you to do that.  You too.  You too.  You.  All of you guys.  That Tweet was for you guys.  For us.  For YOU."

**James McNamara,** 61, pleaded guilty to one count of assaulting a federal officer in May, and was sentenced to 12 months in prison, 24 months of supervised release, and ordered to pay $2,000 in restitution.  According to court documents, just before 3:15 p.m. on Jan. 6, 2021, McNamara witnessed protestors being forcibly removed from the building through the closed North doors by law enforcement officers.  McNamara then ascended the steps toward the doors

and lunged at the officers, swinging his arms with a clenched fist.  In addition, McNamara picked up a bike rack and rammed it into the doors at least four times, officials said.  He gained entry through the first set of doors before being removed by officers.

**Daniel Leyden**, 55, pleaded guilty to assaulting, resisting, or impeding law enforcement officers. **Joseph Leyden**, 56, pleaded guilty on May 23, 2023, to assaulting, resisting, or impeding law enforcement officers.  Daniel Leyden was sentenced by U.S. District Judge Trevor N. McFadden to 38 months in prison and 12 months of supervised release.  His brother Joseph Leyden, 56, was sentenced to six months in prison and 12 months of supervised release by Judge McFadden.  According to court documents, Daniel and Joseph Leyden were among the rioters who were illegally on the Capitol grounds on Jan. 6, 2021.  Shortly after 12:50 p.m., Daniel Leyden was in a crowd that confronted law enforcement officers at metal barricades near the Peace Circle.  Daniel Leyden and other rioters repeatedly lifted and pushed a metal barricade. These actions caused a U.S. Capitol Police officer to fall backwards, pinning the officer under the barricade.  At the same time, several other officers were also assaulted by the rioters with the barricade, including one who was knocked unconscious and suffered a concussion.  Daniel Leyden's actions contributed to injuries that these officers sustained and prevented officers from defending themselves and providing aid to one another.  Daniel Leyden and other rioters then swarmed past the police.  Joseph Leyden was among rioters at the West Plaza at the Capitol, where at approximately 1:14 p.m., rioters began to pull other metal barriers into the crowd, compromising the ability to law enforcement officers to re-establish a perimeter.  Joseph Leyden advanced and rushed towards an officer with the Metropolitan Police Department.  He then lunged at and pushed the officer.

**Quinn Keen, 36**, was sentenced to 24 months in prison, 24 months of supervised release,

and ordered to pay $2,000 in restitution by U.S. District Judge Timothy J. Kelly.  Keen pleaded

guilty on Feb. 20, 2024, to a felony charge of assaulting, resisting, or impeding certain officers.

According to court documents, Keen traveled to Washington, D.C., from Illinois to protest the

2020 presidential election results.  After arriving in the District, Keen walked toward the Capitol

building with other protestors and, by 1:14 p.m., was within the restricted area and had made his

way to the Lower West Terrace.  There, Keen joined other rioters facing off against U.S. Capitol

Police (USCP) and Metropolitan Police Department (MPD) officers who had formed a police

line behind metal barricades to try and stop the crowd from penetrating deeper into the restricted

area.  Keen confronted the officers holding the police line multiple times.  He approached the

police line and initially threw the contents of a water bottle at officers, then tossed the empty

bottle at them.

　　　　As Keen was throwing the water bottle at officers, other rioters grabbed one of the metal

barricades that formed part of the police line and wrestled it away from officers and to the

ground.  As an MPD officer tried to retrieve the barricade, Keen shoved the officer with both of

his hands, pushing the officer backward.  Then, at about 1:15 p.m., Keen threw a metal travel

mug at officers, which deflected off an officer's plexiglass riot shield and fell to the ground.

　　　　When rioters eventually breached the police line, Keen advanced with the mob up the

Northwest Stairs to the Capitol building and was observed entering the U.S. Capitol through the

Upper West Terrace door at about 2:38 p.m.  Once inside, Keen traveled up a staircase and into

the Capitol Rotunda.  While in the Rotunda, Keen celebrated with other rioters and smoked a

marijuana joint.  Keen was fully aware at the time he entered that he did not have permission to

enter the Capitol building, yet he knowingly remained inside for approximately 37 minutes.

　　　　The pattern that emerges from the sentencing of January 6th of defendants who

participated in the January 6, 2021, attack on the U.S. Capitol, is that many of these individuals used physical violence against officers, including striking, spraying chemicals, throwing objects, and in some cases, weaponizing items such as flagpoles and barricades. Their actions often involved leading or inciting others in the mob.

Some defendants involved in the Capitol breach cited their military service as a mitigating factor, yet still received prison sentences, underscoring the gravity of their actions. However, those who received lengthy prison terms engaged in significantly more egregious or violent conduct on January 6th than Mr. Bishop. They incited others, encouraged the mob, destroyed property, and boasted about their involvement on social media—actions Mr. Bishop did not partake in at any time.

Mr. Bishop's conduct aligns more closely with defendants who received sentences at the lower end of the advisory guidelines. Like them, Mr. Bishop did not engage in property destruction, incite others to riot while on Capitol grounds, nor did he post anything on social media or celebrate the events in any way. Additionally, he cooperated fully with the FBI, providing an interview and all requested information, and he pled guilty early in the proceedings. Mr. Bishop has the full support of his wife, Tonya, his parents Harold and Jeanene, his brothers Mike and Justin, among others. Justin Bishop wrote:

> Dozens of fathers, mothers, sons and daughters are alive today because of Bryan's bravery, skill and immense personal sacrifice. Most of these people did not know Bryan, and he did not know them, prior to their hour of need when Bryan ran to their aid, at times under enemy fire, to administer life-saving treatment. For the mortally wounded, for the lives he could not save, Bryan's presence provided a measure of warmth, compassion and comfort in their final moments.

*See Exhibit 3* (August 11, 2024 Letter from Justin Bishop).

Bryan's parents wrote:

As Bryan's parents, we would like to share some of our thoughts about Bryan.

Bryan honorably served his country in the Unites States military for 21 years.  As a combat medic Bryan was in many active combat situations. He has been highly decorated for many of his acts of heroism and valor. He is credited, by the military, for saving many lives and easing the suffering of countless others.

Multiple deployments to hostile environments have come at a great cost for Bryan. He suffers from PTSD.

Insomnia, flashbacks, anxiety, and panic attacks are all constant reminders that PTSD is a lifelong affliction.  It has cost him his marriage and has damaged his relationship with his children.

Despite his struggles with PTSD, Bryan is rebuilding his life.  He has remarried and is in a loving, supportive relationship with his wife, Tonya. We have every hope that life will be easier for him as time goes on.

*See Exhibit 4* (Letter from Hal and Jeanene Bishop).

In one email to undersigned Counsel, Jeanene Bishop recounted the following

story:

As a registered nurse I worked in the emergency room at 97th General Hospital in Frankfurt, Germany from 1985-1987. During that time Bryan age 14-15 decided he would like to volunteer in the ER on weekends and after school.

Bryan quickly became a valuable asset as he assisted the patients and staff. He had the ability to quickly see what needed to be done and stepped in to help any place he could. Bryan assisted many patients and comforted children, making their ER visit easier for them.

Bryan helped keep the ER running smoothly by helping the staff. He ran errands, took specimens to the lab and transported patients, thereby allowing the regular staff to do the more technical and highly trained tasks. I believe it was this initial exposure to the medical field that ignited the spark in Bryan which led him into the service of caring for other people.

Bryan learned valuable skills during the time he volunteered. These skills served him well during the 21 years he treated the sick and injured and

saved  lives, many times while risking his own, as a Navy corpsman and Air Force medic.

Not only did Bryan treat the sick and injured he trained many others to do the same, thereby helping countless people and saving many lives.

Looking at Bryan's military record it is evident that his desire and ability to help others has been on going throughout his life.

*See Exhibit 5* (Email from Jeanene Bishop to defense counsel).

Finally, Ms. Tonya Bishop best explains Mr. Bishop's daily ordeals in her

August 19, 2024 letter to the Court:

> I'd like to touch on his memory, or lack thereof. His faulty memory is a huge part of his daily life and plays a role in his part of the January 6th events. Bryan is beyond remorseful for his actions, actions he has no memory of. He cannot conceptualize having committed any act of inflicting harm on another person, let alone using pepper spray on an officer. It's understandable that one would   raise an eyebrow in doubt at the idea that somebody couldn't remember such an act. Yet, it's true. Bryan's reality includes having memory issues over the most basic things. I continually remind Bryan about taking his meds, appointments coming up, people's names, what we had a conversation about concerning a specific topic, what he ate for breakfast, did he shower, where to find something he has accessed a number of times before. As frustrating as it is for me some days, imagine what it's like for him.
>
> Bryan and I are both aware that the goal is to sentence him in such a   way that would ensure he doesn't reoffend in the future, and to set an example to others in a way that would deter anyone else from committing the same or similar offense. I know that Bryan wishes he had the opportunity to apologize to the officers, his remorse has affected us in profound ways. I hope that you will consider a  sentence other than prison for Bryan. He has served his country for the greater part of his life and has lost out on many of the perks that most Americans take for granted. You and I can walk the streets and feel a measure of safety, yet he doesn't. Most Americans are able to go to sleep at night, cosey in their beds, Bryan relives the gore and atrocities of war.

*See Exhibit No. 6* (Letter from Tonya Bishop).

**IV.  CONCLUSION**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 128 S.Ct. 586, 598 (2007) (*citing Koon v. United States*, 518 U.S. 81, 113 (1996)). Mr. Bishop is a first offender, may have exercised poor judgment by accompanying his then girlfriend Tonya to the Trump "Stop the Steal Rally" knowing he suffers from PTSD and TBI. Looking back, Mr. Bishop knows that given his fragile ▮▮▮▮▮▮, he should have avoided the large crowd at the Capitol building. He allowed his desire to continue courting Tonya to influence his decision to go to D.C. He wanted Tonya to know that he supported her decision to go hear Donald Trump speak. Since the events on January 6, 2021, Tonya and Mr. Bishop have gotten married. Bryan did not have a political agenda and truly regrets spraying the two police officers with pepper spray on January 6th. Mr. Bishop's actions will follow and deter him for the rest of his life.

As set out above, taking into account Mr. Bishop's history and characteristics, in combination with the facts of the offense a sentence of 18 months of home detention, community service, 2 years of supervised release, $2000 in restitution will satisfy the 18 U.S.C. §3553(a) factors.

Dated: August 22, 2024          Respectfully submitted,

*Lionel Andre*
_____
Lionel André
SECIL Law, PLLC
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
landre@secillaw.com
(703) 232-4622
*Attorney for Bryan R. Bishop*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2024, I caused a copy of the foregoing  Memorandum in Aid of Sentencing to be served on Sonia Murphy via the Court's electronic filing system.

/s/ Lionel André
Lionel André